874 F.2d 147
 INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey,
Arthur Goslee, Robert Maloney, and Calvin Milligan
on their own behalf and on behalf of all
others similarly situated,
Plaintiffs/Appellees,
v.
Cyril H. WECHT, President of the Allegheny County Board of
Prison Inspectors, and the other members of the Board;
Thomas Foerster and William H. Hunt, Commissioners for
Allegheny County; Frank J. Lucchino, Controller for
Allegheny County; Eugene Coon, Sheriff for Allegheny
County; The Honorable Patrick R. Tamilia, Michael J.
O'Malley, and Marion K. Finkelhor, Judges, Court of Common
Pleas of Allegheny County; Richard S. Caliguiri, Mayor of
the City of Pittsburgh; Harriet McCray; Msgr. Charles Owen
Rice, and Charles Kozakiewicz, Warden of the Allegheny
County Jail; and William B. Robinson, Executive Director of
Prison Inspectors; and Cyril Wecht, Thomas Foerster and
William H. Hunt, as Commissioners of Allegheny County,
Defendants/Appellants,
v.
The COMMONWEALTH OF PENNSYLVANIA; the Commonwealth of
Pennsylvania, Department of Corrections; David S. Owens,
Jr., Commissioner, Department of Corrections, and Erskind
Deramus, Deputy Commissioner, Department of Corrections,
Third Party Defendants/Appellees.
 Nos. 88-3820, 88-3871.
 United States Court of Appeals,
Third Circuit.
 Argued April 3, 1989.
Decided May 4, 1989.
Rehearing and Rehearing In Banc Denied June 9, 1989.
 
 James J. Dodaro, County Sol., George C. Diamantopulos (argued), Asst. County Sol., Allegheny County Law Dept., Pittsburgh, Pa., for Cyril H. Wecht, et al., defendants/appellants.
 Donald Driscoll (argued), Neighborhood Legal Services Assn., Pittsburgh, Pa., for Inmates of Allegheny County, et al., plaintiffs/appellees.
 Ernest D. Preate, Jr., Atty. Gen., Thomas F. Halloran, Sr. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Calvin R. Koons, Deputy Atty. Gen., Pittsburgh, Pa., for The Com. of Pa., et al., third party defendants/appellees.
 Before GIBBONS, Chief Judge, and BECKER and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Once more, and undoubtedly not for the last time, we are presented with an appeal by officials of Allegheny County from an order of the district court in the thirteen-year-old dispute over unconstitutional conditions of confinement at the Allegheny County Jail. To the extent that the order appealed from, dated December 20, 1988, is appealable, we will affirm.
 
 I.
 Prior Proceedings
 
 2
 The Allegheny County Jail in Pittsburgh, Pennsylvania was erected in 1886. At the time of its construction the population of the County was approximately 450,000. (The U.S. Census reported 355,869 residents in 1880 and 551,959 in 1890). The 1983 population was 1,385,558. In 1886 the County had six Common Pleas Judges; now forty-five judges sit there. The jail was designed, in connection with the county courthouse, by the great architect Henry Hobson Richardson. In 1976 the jail was placed on the National Register of Historic Places. Its recognition as an historic landmark, however, coincided with the commencement of this class action on behalf of past, present, and future inmates, for in 1976 a complaint was filed alleging that conditions in Richardson's grim fortress violated their Fifth, Eighth, and Fourteenth Amendment rights.
 
 
 3
 On January 4, 1978, after a six-week trial, the district court held that conditions in the jail violated the Constitution in many respects. Owens-El v. Robinson, 457 F.Supp. 984 (W.D.Pa.1978). The county defendants did not appeal. The class representatives did, however, and this court remanded for consideration of changes in the decree necessary to upgrade the psychological treatment facilities in the jail to the constitutional minimum. Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir.1979).
 
 
 4
 On remand, after a five-week trial, the district court found that the level of care for mentally ill inmates amounted to deliberate and unconstitutional indifference. The court also found that the county officials were not in full compliance with the October 11, 1978 decree. The court ordered such compliance as well as additional steps to bring treatment of the mentally ill inmates up to constitutional minimum standards. Inmates of Allegheny County Jail v. Pierce, 487 F.Supp. 638 (W.D.Pa.1980). No appeal was taken from this judgment.
 
 
 5
 During the seventies overcrowding in the jail had not become an issue, and was not addressed in the initial class action. The average daily inmate population in 1975 was only 429, and the court in 1978 observed in passing that "[o]vercrowding of the institution is not a problem." Owens-El v. Robinson, 442 F.Supp. 1368, 1376 (W.D.Pa.1978). By April of 1983, however, the average daily population had risen to 690, and as a consequence jail conditions seriously deteriorated. That month the class representatives obtained an order directing the county officials to show cause why they should not be held in contempt for non-compliance with the court's prior orders, and moved for additional relief. On May 25, 1983, after a six-day hearing, the district court found that the maximum constitutional capacity of the facility was 475-500 males in the main unit, 63 males in the receiving unit, and 38 females in the female section--an upper limit of 575-600. The court found 705 inmates in the jail on the day it toured it, and found:
 
 
 6
 The jail is now dangerously overcrowded. Fires and prisoner unrest are an ever-present danger in any penal setting. Here they could result in disaster. The Allegheny County Jail is a catastrophe waiting to happen.
 
 
 7
 Inmates of Allegheny County Jail v. Wecht, 565 F.Supp. 1278, 1281 (W.D.Pa.1983) (emphasis in original). By order of May 25, 1983 the court ordered phased reductions of the jail population as follows:
 
 
 8
 a. After July 1, 1983, there shall be no more than 650 male and 60 female inmates housed in the jail;
 
 
 9
 b. After August 15, there shall be no more than 600 male and 50 female inmates housed in the jail;
 
 
 10
 c. After October 1, 1983 there shall be no more than 550 male and 40 female inmates housed in the jail;
 
 
 11
 d. After January 1, 1984 there shall be no more than 500 male and 30 female inmates housed in the jail.
 
 
 12
 No appeal was taken from the May 25, 1983 order.
 
 
 13
 By October 20, 1983 it was clear that the County authorities were not meeting the population cap, and the court addressed their August 4 and September 30 motions for upward modification. Finding that the dangerously overcrowded conditions in the jail were just as serious as on May 25, 1983, the court ordered the release of those prisoners held in the lowest amount of bail until the population limits of the May 25 order were met. The court made it clear that the release remedy was a temporary expedient, noting:
 
 
 14
 It is the duty of the County to house prisoners, and any release of prisoners as a result of this order should be recognized as a final, albeit temporary, effort to ameliorate the situation, not as a solution to the problem.
 
 
 15
 Inmates of Allegheny County Jail v. Wecht, 573 F.Supp. 454, 457 (W.D.Pa.1983). No appeal was taken from the October 20, 1983 order.
 
 
 16
 By late December 1983, 14 males and 12 females had been released, and it became clear to the district court that no permanent solution was in the offing. To provide an incentive for such a solution the court ordered "that after February 15, 1984, a sanction of $5,000 against the defendants for each prisoner released under the court's order of October 20, 1983" would be assessed. Thereafter the court denied the request of the County authorities to increase the population cap as well as a request to house some inmates temporarily in a trailer within the jail compound. Finding heating problems, fire hazards, and lack of constitutionally required support services the court reaffirmed the population caps in the October 20, 1983 order. The County authorities appealed from the denial of their request to raise the population caps, and from the $5,000 sanction order.
 
 
 17
 This court on January 29, 1985 affirmed the order reconfirming the population caps. We reluctantly vacated the contempt sanctions, reasoning that the County officials could not be held in contempt for failure to develop substitute jail facilities because the court's previous orders were not sufficiently explicit to satisfy Fed.R.Civ.P. 65(d). Inmates of Allegheny County Jail v. Wecht, 754 F.2d 120, 127-30 (3d Cir.1985). We made it clear, however, that the district court had the power to order production of such a plan, observing:
 
 
 18
 Orders to responsible public officials to prepare and submit plans for remedying constitutional violations are not uncommon. Such orders often issue in the school desegregation context.
 
 
 19
 Similarly, in the prisoner context the courts have authority to order local officials to take costly measures to cure constitutional violations.
 
 
 20
 754 F.2d at 128 n. 5 (citations omitted).
 
 
 21
 On remand the district court after a hearing on February 20, 1985 ordered the County officials "to apprise the court as to ... [p]lans for alternate facilities in order to prevent the further release of prisoners." The court indicated that "[i]f no plan is presented, the court will order further appropriate action at that time." Inmates of Allegheny County Jail v. Wecht, 612 F.Supp. 874, 877 (W.D.Pa.1985). A week later, the court after a hearing determined that although the County was then in compliance with the cap, "the measures taken by the County continued to be, in essence, a stopgap approach to a serious and continuing problem." Id. at 877-78. The court ordered that the County have adequate facilities in place by May 6, 1985 or be subject to a $5,000 contempt fine for each prisoner released. When the County failed to meet this deadline, contempt fines were commenced. The County authorities appealed from the order directing that they develop a plan for new facilities, and from the order imposing fines.
 
 
 22
 Before these appeals were heard, the district court was forced to deal with a new mode of evasion. In a hearing on a motion by the class representatives for further relief it was revealed that the County was complying with the population cap by refusing to admit inmates committed to jail. As a result, committed inmates were being detained in local police lockups not designed for overnight use. Finding the practice unconstitutional the district court enjoined it, and ordered the County to accept any prisoner committed to jail before spending more than twelve hours in police lockups. Inmates of Allegheny County Jail v. Wecht, 612 F.Supp. at 878-84. The County officials likewise appealed from this order.
 
 
 23
 The appeals from the orders directing preparation of a plan, imposing the contempt fines, and prohibiting overnight use of police lockups, were never addressed in this court. Faced with mounting fines the County some time in 1985 commissioned a study entitled Allegheny County Criminal Systems Facilities Report, by a firm called L. Robert Kimball & Associates which recommended against attempting to renovate the historic jail. In June of 1986 the County had managed to complete a jail annex, in a converted office building a block away, with 274 cells capable of housing 435 inmates double-celled. By then fines against the County for releasing prisoners to comply with the population cap totaled $2,090,000. The County requested this court to remand, while retaining jurisdiction, for the purpose of implementing an amicable settlement. We did so on May 19, 1986.
 
 
 24
 As part of that settlement the district court remitted the $2,090,000 in fines. In the order to that effect, however, the court stated:
 
 
 25
 [s]uffice it to say that following the 1976-77 hearings, court inspections, and the involvement of court-appointed monitors, conditions at the Allegheny County Jail did improve, but it was still an antiquated 100-year-old facility.
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 The new auxiliary jail appears to be an excellent facility. We are particularly concerned, however, about the condition of the old jail. The Warden and his personnel are doing the best they can at this point in a very old and decrepit building. A study should be made to determine whether it is better to continue the old jail as a jail, or to build elsewhere and convert the jail building to another use. This should be done now, not after another crisis.
 
 
 29
 Memorandum Order, June 2, 1986 at 2, 4 (emphasis added). The court noted the statutory duties of the Allegheny County Prison Board under state law, 61 Pa.Stat.Ann. Sec. 407.1 et seq. and concluded that "our review today of what the Allegheny Prison Board is required by law to do is intended to give fair warning for the future." Id. at 6. The parties then entered into a stipulation providing that:
 
 
 30
 1. All prior orders would continue except as modified by the stipulation.
 
 
 31
 2. The Annex would operate at full capacity by July 31, 1986.
 
 
 32
 3. The capacity of the Annex would be 274 inmates single celled, 435 double celled.
 
 
 33
 4. No double celling would be permitted unless inmates were allowed 12 hours outside the cells.
 
 
 34
 5. All female inmates would be housed in the Annex.
 
 
 35
 6. The mental health unit in the jail would be doubled to 40 beds, with appropriate modifications and services.
 
 
 36
 7. Six cells in the female unit in the Annex would be set aside for mental health problems.
 
 
 37
 8. The jail officials would submit a progress report after one year.
 
 
 38
 9. The male population cap in the old jail would be increased to 540 when the Annex was at full capacity and the former female section in the old jail thus made available for males.
 
 
 39
 10. The county would pay counsel fees to the attorneys for the plaintiff class.
 
 
 40
 11. Court costs would be paid by the county.
 
 
 41
 12. The pending appeals would be dismissed.
 
 
 42
 Stipulation, June 4, 1986. On June 11, 1986 this court, pursuant to the stipulation, dismissed the County's consolidated appeals.
 
 
 43
 The truce embodied in the June 4, 1986 stipulation proved to be, like the Lebanese variety, of short duration. By January of 1988 the County authorities were back in the district court seeking an order lifting the population caps, while the class representatives moved for sanctions and additional relief on account of the deteriorating condition of the old jail and overcrowding in the Annex. On February 9, 1988 the court found that there had been chronic violations of the population caps at both facilities. Memorandum Order, February 9, 1988 at 2, 3.
 
 
 44
 Noting that the conditions in both facilities violated the stipulation at least, if not the Constitution, the court nevertheless denied the class representatives' motion while the County sought through litigation in the Pennsylvania courts to have the Commonwealth take some sentenced prisoners off its hands. On July 28, 1988 the Pennsylvania Supreme Court rejected the County's effort to move prisoners to state facilities. Allegheny County v. Commonwealth, 518 Pa. 556, 544 A.2d 1305 (1988).
 
 
 45
 With no relief in sight from the Commonwealth, a further hearing was held in the district court on October 13, and 14, 1988. That hearing produced the November 17, 1988 order appealed from. That order provides in relevant part:
 
 
 46
 1. no inmates shall be housed in the main facility of the Allegheny County Jail after June 30, 1990;
 
 
 47
 2. on or before May 1, 1989, the county shall submit to the court a plan for construction of a new facility or alternative housing, accommodating at least 900 inmates, not counting the 435 inmates housed in the Jail Annex.
 
 
 48
 3. the county's Motion to Increase Population Cap be and hereby is conditionally GRANTED. The county may house inmates in the 20 utility room areas in the Jail if, in the opinion of the Court Monitor, these are converted to habitable cells. The county may further house up to an additional 20 inmates in the Jail to the extent that the Warden can keep the number of inoperable cells to a minimum. Said population increases may be made only if (1) the position of Population Control Officer at the Jail is filled, and (2) in the opinion of the Court Monitor the Jail remains in substantial compliance with the prior orders of this court relative to conditions.
 
 
 49
 4. plaintiffs' Motion for Sanctions be and hereby is GRANTED. The county is ordered to pay a fine in the amount of $25,000 to the Clerk of Court on or before Friday, December 2, 1988.
 
 
 50
 The County officials appeal from paragraphs 1, 2 and 4. We address each paragraph, although not in the same order.
 
 II.
 The Contempt Sanction
 
 51
 This court has appellate jurisdiction over the order imposing a contempt sanction for prior violations of the district court's injunction because that order is a final judgment. 28 U.S.C. Sec. 1291. Commonwealth of Pennsylvania v. Local Union No. 542, International Union of Operating Engineers, 552 F.2d 498 (3d Cir.1977), cert. denied sub nom., Freedman v. Higginbotham, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977).
 
 
 52
 The scope of review is limited to these questions: did the order give fair notice, was the contempt hearing procedurally proper, did contemnors violate the order, and was compliance with the order physically possible. The validity of the underlying order is not open to consideration. Halderman v. Pennhurst State School & Hospital, 673 F.2d 628, 636-37 (3d Cir.1982) cert. denied, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).
 
 
 53
 The court imposed a $25,000 fine, payable to the Clerk of Court on or before Friday, December 2, 1988. When the fine was not paid on that date the court imposed an additional fine of $5,000. The $25,000 fine was imposed because the County officials failed to comply with several provisions of prior orders, including inmate population caps in the May 4, 1984 and February 25, 1985 orders, the requirement for trained psychiatric nurses in the October 11, 1978 order, the requirement of one guard and one nurse for each shift in the Mental Health unit in the April 17, 1980 order, and the requirement that there be sufficient nursing staff so that one nurse will be present in the Mental Health unit at all times in the May 25, 1985 order.
 
 
 54
 The County officials do not contend that these orders did not give fair notice of the conduct they prescribed or proscribed. Compare Inmates of Allegheny County v. Wecht, 754 F.2d at 127-30. Nor do they contend that the contempt hearing was procedurally irregular. Nor do they dispute that the orders were not complied with in the specific respects noted by the district court. Their sole contention is that they were unable to comply. In advancing this contention they rely on United States v. Bryan, 339 U.S. 323, 330-31, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). The Bryan defense of inability to comply, however, refers to physical impossibility beyond the control of the alleged contemnor. The orders in question were directed to all the defendants, and the suggestion that it was physically impossible for Allegheny County to obey the order in the respects in which they were held to be in contempt is sophistical. The County officials simply chose to take no steps to provide the Warden and his staff with the wherewithal to comply. Such conduct exposes the party responsible to contempt. Pennhurst State School & Hospital, 673 F.2d at 639.
 
 
 55
 Alternatively, the County contends that the fine was not a proper civil contempt remedy since it is not remedial. See Ramos Colon v. U.S. Attorney for the District of Puerto Rico, 576 F.2d 1 (1st Cir.1978). That argument is no more persuasive than the County's reliance on the defense of impossibility. More was at stake than merely vindicating the dignity and authority of the court. The orders which were disobeyed are still in place, and the district court imposed the fines for the clear purpose of deterring their violation in the future.
 
 
 56
 The orders imposing a $25,000 and $5,000 fine for violations of outstanding injunctions will therefore be affirmed.
 
 III.
 The Jail Closing Order
 
 57
 As noted above, the November 17, 1988 order provides that "no inmates shall be housed in the main facility of the Allegheny County Jail after June 30, 1990." This order modifies a prior injunction, which permitted use of the old jail subject to a population cap and other limits. It is therefore appealable under 28 U.S.C. Sec. 1292(a)(1). We review the district court's findings of fact in support of the modification of the injunction by the clearly erroneous standard of Fed.R.Civ.P. 52. If those findings disclose a constitutional violation, our review of the district court's remedial order turns on whether the court committed a clear abuse of discretion. See, e.g., Hodge v. Hodge, 621 F.2d 590, 593 (3d Cir.1980). When the totality of conditions in a jail violates the Constitution a district court need not confine itself to the elimination of specific conditions. Miller v. Carson, 563 F.2d 741, 751 (5th Cir.1977). Rather, the nature of the overall violation determines the permissible scope of an effective remedy. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). A remedy cannot, however, go beyond the constitutional violations found. Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977) (Milliken II ).
 
 
 58
 The district court determined that inevitable and unavoidable conditions at the old jail violate the Constitution now, and will do so to a greater extent in the future. If the court applied the proper legal standard and its findings are not clearly erroneous in these respects, the order requiring that the jail not be used to house inmates is an appropriate remedy. Jordan v. Wolke, 593 F.2d 772, 775 (7th Cir.1978); Rhem v. Malcolm, 507 F.2d 333, 341 n. 19 (2d Cir.1974).
 
 
 59
 The old jail currently houses both pretrial detainees and convicted prisoners, and they are not segregated. Pretrial detainees retain the presumption of innocence, and may not be held in conditions amounting to punishment. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Sentenced inmates may be held in punitive conditions as long as those conditions do not fall below Eighth Amendment standards for punishment. Rhodes v. Chapman, 452 U.S. 337, 344-45, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Where both convicted inmates and pretrial detainees are housed together the higher standard applicable under the due process clause should govern their common condition. E.g., Reece v. Gragg, 650 F.Supp. 1297, 1300 (D.Kans.1986). Here, however, the district court applied the cruel and unusual punishment standard of Bell, 441 U.S. at 542, 99 S.Ct. at 1875, and Rhodes, 452 U.S. at 344-45, 101 S.Ct. at 2398. Thus, the district court measured the defendants' constitutional obligation by the standard applicable to the sentenced inmates. Certainly, therefore, the County officials cannot contend that the court abused its discretion with respect to the applicable legal standard.
 
 
 60
 Turning to the facts, the district court relied on several factors in support of the finding that the old jail is inherently constitutionally inadequate. The court deemed lack of space for adequate mental health care the most grievous problem. The American Medical Association has set forth three prerequisites for adequate psychiatric care in a penal institution: (1) a safe sanitary environment; (2) adequate staffing and security to prevent assault and suicide; and (3) trained personnel for treatment and close observation. AMA Standards for Health Services in Jails, at 10 (1981). This court has already held that a denial of access to personnel qualified to diagnose and treat mental illness is a constitutional violation. Inmates of Allegheny County, 612 F.2d at 765. The court found that "[t]he confined space at the jail prohibits the construction of constitutionally adequate mental health facilities." (A. 20). This finding is not clearly erroneous. The record established in 1980 that 10% to 30% of the jail population could be considered seriously mentally ill. The record does not disclose any improvement in inmate mental health. The 40 mental health cells, along with 12 overflow cells, are regularly filled to capacity. The mental health facility is understaffed, lack of space hampers the recruitment of qualified nurses, and the County's own Ad Hoc Committee on Jail Medical Procedures noted the "physical limitations to the building erected a hundred years ago." (A. 20). The district court found that the confined space in the jail prohibits construction and operation of constitutionally adequate mental health facilities.
 
 
 61
 The district court also found other unremediable physical limitations. Chief among these is an antiquated heating system, the ductwork for which would channel smoke and noxious fumes throughout the cells in case of a fire. The building lacks a sprinkler system, and contains faulty electrical wiring. The central cellblock unlocking system chronically breaks down, exposing inmates to the prospect of being trapped in cells in the event of a fire. The gymnasium, measuring 45' 10" X 63', furnishes the only exercise area in the facility. Food service, access to showers, and access to counseling, all suffer because of the jail's age, size, and deteriorating condition.
 
 
 62
 On top of these seriously hazardous conditions the district court found that there was the persistent problem of overcrowding. This court has already noted that such overcrowding may be unconstitutionally punitive. Inmates of Allegheny County Jail, 754 F.2d at 127; see also Lareau v. Manson, 651 F.2d 96, 103 (2d Cir.1981); Rhem, 507 F.2d at 342. The County argues that overcrowding as a constitutional violation can be remedied by imposing a population cap. The district court's experience with such a cap, however, has amply demonstrated that it has not been an effective remedy for the several constitutional violations previously adjudicated. Moreover, the County's own study by L. Robert Kimball & Associates (A. 559-94) describes numerous interrelated structural and operational problems in the old jail and recommends against renovation as both costly and ineffective. Finally, the district court noting the projection in the Kimball Report of the need to house 1095 inmates by the year 1990 and 1339 inmates by the year 2000, observed:
 
 
 63
 These projections appear to be low, since even today the average daily population at the Jail alone would approximate 620 inmates if no releases occurred. When this is added to the 435 inmates housed in the Annex the total is 1055. At the hearing on this matter on October 13, 1988, an expert in demographics, Hunter Hurst, testified that the county will require a total jail capacity for 1300 inmates by 1995 and 1400 inmates by the year 2000. (A. 63).
 
 
 64
 Besides the general problem of overcrowding, the court noted that as designed in 1886 the floor space in each cell falls far short of the minimums recommended as psychologically necessary by the American Public Health Association, and as penologically necessary by the American Correctional Association. The court found that the cells are simply too small to provide humane living conditions, and that there is no way for the structure to be made adequate. (A. 73).
 
 
 65
 One response made by the County officials to these well supported findings of fact is to suggest that they cannot be credited because at one point in this protracted litigation the district court, after an inspection on February 5, 1988, observed that the old jail appeared to be "in good physical condition and operating smoothly; a vast improvement from the conditions that existed in 1976." (A. 21). The memorandum opinion containing this observation, complimentary to the Warden, expressly refrained from determining whether conditions in the old jail violated the Constitution, and set the matter down for an evidentiary hearing. Thus the reference to the court's observation about improved conditions has no relevance to the findings made after that evidentiary hearing took place.
 
 
 66
 The record response made by the County officials to the court's well supported findings is to point to testimony of Lynette Watson, the court appointed jail monitor, that the old jail is "neat ... [and] ... clean." (A. 400, 402-03, 406). The court monitor's testimony, however, taken in context, refers only to matters of sanitation and lighting. It does not address the issues of structural defects, cell space, fire hazards, inadequate mental health facilities, and overcrowding. The court monitor did comment on ventilation, but qualified her observations by noting that she checked only "those things that one could check by visual inspection and by asking questions." Other evidence in the record amply supports the district court's findings of unconstitutional conditions.
 
 
 67
 Since the court's findings of fact with respect to the totality of conditions at the old jail are not clearly erroneous, and it applied the Eighth Amendment standard in determining the constitutionality of those conditions, we cannot hold that the order directing that the County cease housing inmates in that facility was an abuse of discretion. The County officials' last desperate argument, that the order should have been made, if at all, years ago, is not supported either by logic or by authority. Other pressing problems existed and were addressed at the outset of the litigation. The overcrowding which has developed since entirely changed the remedial posture of the case.
 
 
 68
 The order that "no inmates shall be housed in the main facility of the Allegheny County Jail after June 30, 1990" will therefore be affirmed.
 
 IV.
 The Order to Prepare a Plan
 
 69
 The County officials seek to appeal from the direction in the November 17, 1988 order that by May 1, 1989 they "shall submit to the court a plan for construction of a new facility or alternative housing, accommodating at least 900 inmates not counting the 435 inmates housed in the Jail Annex." That effort presents a question of appellate jurisdiction. The order does not qualify as a final judgment within the meaning of 28 U.S.C. Sec. 1291. An order to submit a remedial plan that contemplates further action by the court is by definition not final. Hoots v. Pennsylvania, 587 F.2d 1340, 1347 (3d Cir.1978). Authority for our review of the plan order, therefore, is conferred, if at all, by 28 U.S.C. Sec. 1292(a)(1). The County officials urge that we have such authority. The class representatives contend that we do not.
 
 
 70
 An order appealable as an injunction under section 1292(a)(1) must:
 
 
 71
 adjudicate some of the relief sought in the complaint ... [and] ... must also be of such nature that if it grants relief it could be enforced pendente lite by contempt if necessary.
 
 
 72
 Cohen v. Board of Trustees of the University of Medicine and Dentistry of New Jersey, 867 F.2d 1455, 1465 (3d Cir.1989) (in banc). There is no question that the order to produce a plan is one which will be enforced by contempt. Indeed the district court, in the opinion accompanying the order, informed the County that for each month after May 1989 that a plan is not filed the defendants will be fined a sum to be determined. (A. 20). Thus one of the two section 1292(a)(1) requirements is satisfied. The more problematical question is whether the order adjudicates some of the relief sought in the complaint.
 
 
 73
 In deciding this more problematical question in the context of a suit addressed at remedying unconstitutional conditions this court and others have focused on whether a plan order (1) is inseparable from the rest of an order that is clearly an appealable injunctive order, or (2) specifies the nature and content of the plan to be submitted. Hoots, 587 F.2d at 1349; Hendrickson v. Griggs, 856 F.2d 1041, 1044 (8th Cir.1988). We conclude that the instant plan order satisfies neither requirement.
 
 
 74
 The plan order is unquestionably separable from the contempt order. The County officials do not contend otherwise. They contend, rather, that the plan order is inseparable from the order closing the old jail. We conclude otherwise. The court's findings as to future inmate population establish the need for additional inmate capacity whether or not the old jail continues in use. The constitutionally adequate Annex accommodates 435 inmates, and the constitutionally inadequate old jail 540--far short of the projected inmate population. Thus a plan for additional housing is required even if the old jail were to be continued in use. The plan order thus can be considered apart from the shutdown order. The shutdown order is not conditioned on court approval of any plan which may be submitted. The two orders are separable. See Frederick L. v. Thomas, 557 F.2d 373, 380-81 (3d Cir.1977).
 
 
 75
 Appealability must rest, then, on whether the order specifies the nature and content of the plan sufficiently to be more than a step toward selection of a remedy, among several possible, for the constitutional violations addressed. We conclude that the order is not sufficiently specific. The plan order does require a significant practical step toward the selection of an ultimate remedy. In that respect it is analogous to a discovery order, which though significant and enforceable by contempt, is not reviewable under section 1292(a)(1). Metex Corp. v. ACS Industries, 748 F.2d 150, 156 (3d Cir.1984). The plan order accords inmates none of the relief requested. Until it is approved by the court it will have no effect on the unconstitutional conditions about which the class representatives complain. The only specific requirement of the plan order is that it provide housing for 900 inmates. The County is free to propose half-way houses, work release centers, minimum security facilities, traditional jail facilities, one facility or several, or any combination of the aforesaid. Whether the County's proposal will be deemed by the court an adequate response to the constitutional violations it has found remains to be seen.
 
 
 76
 We hold, therefore, that the appeal by the County officials from the order directing them to prepare an inmate housing plan by May 1, 1989 must be dismissed.
 
 V.
 Conclusion
 
 77
 The orders directing the County to pay $30,000 in contempt fines will be affirmed. The order modifying the injunction to provide that the Allegheny County Jail may not be used to house prisoners after June 30, 1990 will be affirmed. The appeal from the order requiring the County officials to present to the court a plan for housing 900 inmates no later than May 1, 1989 will be dismissed.